IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01125-MEH

SHAMONE McEWEN,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff Shamone McEwen appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **affirms** the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision denying her application for

DIB and SSI benefits filed February 9, 2011.  [AR 30, 155-64]  Plaintiff initially alleged her disability began February 1, 2010.  *Id*.  After the application was initially denied [AR 93-114, 117-20], an Administrative Law Judge ("ALJ") upon the Plaintiff's request held a hearing on September 11, 2012.  [AR 30]  An impartial vocational expert testified at the hearing.  *Id*.  At the hearing, on the advice of her attorney, Plaintiff amended her alleged onset of disability to September 26, 2010.  *Id*.  Following the hearing, Plaintiff's attorney submitted additional evidence, which was added to the record and considered by the ALJ.  *Id*.  The ALJ issued a written ruling on September 26, 2012, finding that Plaintiff was not disabled since September 26, 2010, because considering Plaintiff's age, education, work experience and residual functional capacity ("RFC"), there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  [AR 27-46]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-6]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on January 19, 1971; she was 40 years old when she filed her application for SSI and DIB benefits on February 9, 2011.  [AR 91]  Plaintiff's initial application for DIB alleged disability as of February 1, 2010, secondary to post-traumatic stress disorder ("PTSD"), depression, and an anxiety disorder.  [AR 93] Plaintiff also noted problems with her knees [AR 213 ("I have bad knees [and] can't squat")], with migraines [AR 59], and with sleeping [AR 63].  She later amended that date to September 26, 2010.  [AR 30, 53]  She has a GED and went to trade

school to become a dental assistant.  [AR 55, 67, 247]  In the past, she worked as a telemarketer, waitress, cashier, receptionist, and dental assistant.  [AR 39]

Plaintiff alleges disability due to PTSD, depression, and anxiety; she noted that her alleged date of disability coincided with the date she went to jail.  [AR 193]  After her release from jail, Plaintiff returned to work part-time conducting surveys via telephone.  [AR 248]  Plaintiff reported that she "gets stressed out" around large groups of people because of her anxiety and PTSD, and that she has insomnia.  [AR 208-09]  She indicated that her anxiety interferes with her concentration, making it difficult to follow instructions and allowing her the ability to concentrate for only five minutes at a time, causing her to have problems finishing things she starts.  [AR 213]

## III.    Medical Evidence

The medical evidence shows Plaintiff began treatment for depression and PTSD on September 8, 2010, at the Arapahoe/Douglas Mental Health Network ("ADMHN") as part of that residential treatment facility's mental health program, which was required for Plaintiff after her release from a six-month jail sentence for theft and escape.[1]  [AR 297, 235]  At her intake session at ADMHN, Plaintiff indicated a "long history" of criminal behavior and of a disruptive and traumatic family history involving sexual abuse and drugs.  [AR 235]  She noted a history of being suicidal as a teenager but that she had not as an adult had thoughts of harming herself.  *Id*.  The record also indicates primary substance abuse of cocaine, stating that she was in "early partial remission" and was on probation/parole.  [AR 233]  Records from Licensed Professional Counselor Nancy Lantz indicated: "her mood is stable due to her medication," "she thinks her judgment is not

---

[1]All of Plaintiff's medical records are from ADMHN unless otherwise noted.

very good if she is not on medication," and "without medication she reports that she has a difficult time sleeping."  [AR 235]

Dr. James Mauldin performed a psychological evaluation of Plaintiff at ADMHN on September 15, 2010, diagnosing her with major depressive disorder (recurrent and in partial remission), PTSD, and cocaine dependence in remission.  [AR 243-44]  He noted her PTSD stems from "an incident in which her boyfriend shot a man who was allegedly raping her."  [AR 243]  Dr. Mauldin's report tracked a long history of "correctional and residential treatment facilities," a drug history starting as a teenager and "extensive" crack cocaine use "up until her most recent incarceration six months ago."  *Id*.  Dr. Mauldin identified Plaintiff's mood as mildly anxious and noted she had poor sleep, but he found she had normal cognition and thought processes.  *Id*.  He assigned her a GAF[2] score of 55.  Plaintiff returned to Dr. Mauldin on October 4, 2010, and reported

_____

[2]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows: The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

good results from her medications, decreased flashbacks as she was avoiding PTSD triggers such as contact with men, and positive experiences at the mental health clinic.  [AR 242]  Dr. Mauldin found Plaintiff was calm and cooperative, in a good mood, and had no evidence of psychosis or mania.  *Id*.  Plaintiff then relapsed with her cocaine addiction in late October 2010; despite that, Dr. Mauldin indicated after a November 2010 visit that Plaintiff was pleasant, that her moods had stabilized, and that she had full affect.  [AR 241]

In early 2011, Plaintiff began treatment with Dr. Amy Ellis, who on April 28, 2011, noted Plaintiff reported she was "doing well" and planning to move out of the residential facility.  [AR 409]  Dr. Ellis wrote that Plaintiff was fully oriented, had normal speech and psychomotor activity,

---

• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

coherent and goal-directed thought processes, good insight and judgment, and intact memory, concentration and attention. [AR 401] Dr. Ellis continued seeing Plaintiff monthly for a year, with Plaintiff sometimes indicating stress and symptoms related to "feeling down" and very tired during the day. [AR 405] On August 17, 2011, Plaintiff saw Dr. Ellis after Plaintiff "passed out" in a grocery store from what Plaintiff called "excessive stress." [AR 403-04] Plaintiff also received from Dr. Ellis a prescription to help with stress-induced headaches. [AR 404] Plaintiff also had stress, Dr. Ellis indicated, from being caught shoplifting in October 2011, resulting in "two panic attacks a day since this happened" (with 10-12 days). [AR 399-400] Despite these symptoms, Plaintiff usually indicated things were going well at home and at work. [*See, e.g.*, AR 396, 400, 402, 408.] Some appointments, however, Plaintiff reported feeling worse: for example in November 2011, when Plaintiff had missed a required random urinalysis, her daughter had stopped talking to her, and her living situation was "stressful," leading her in the interview with Dr. Ellis to be "in a near panic and extremely upset and crying." [AR 398] By February 2012, Plaintiff reported she had moved into her own apartment. [AR 394] On May 9, 2012, Plaintiff admitted she had been again caught shoplifting, yet she felt remorse for doing so. [AR 474]

In September 2012, Plaintiff switched her psychiatric treatment to Dr. Kimber-Lynne Conger, whose notes showed Plaintiff's anxiety had generally improved, but she had to move her desk to a quieter area at work to deal with panic attacks. [AR 636-38] On November 21, 2012, Dr. Conger noted that Plaintiff reported fluctuating moods, depression, self-loathing, and anxiety at work. [AR 634] Plaintiff also had individual psychotherapy every two weeks with Dr. Michael LeBlond. His notes are sparse; however, he provided in February 2012 an evaluation of Plaintiff's

6

records and progress, reporting she continued to struggle with anxiety, mild depression, PTSD, and cocaine abuse, and assessing her a GAF score of 51, indicating "moderate impairments in functioning or moderate symptoms." [AR 303]  On June 6, 2012, he found identical diagnostic results but added kleptomania. [AR 468-69]  Finally, Plaintiff also attended group therapy at ADMHN, with records beginning March 4, 2011. [AR 264-350; 421-66; 499-606; 608-24]  Few notes are specific to Plaintiff; initially she is noted as being agitated or withdrawn [*see, e.g.,* AR 435, 439, 446, 457]; other times goals related to her are noted, such as her indicating she would like to get rid of her depression. [AR 326].

## III.   Medical Source Opinions

Two treating physicians – Dr. Ellis [AR 256-63] and Dr. LeBlond [AR 493-97] – completed a Mental Assessment of Work-Related Activities regarding Plaintiff. Additionally, a consultative examiner hired by SSA, Dr. Gilbert Milburn-Westfall, evaluated Plaintiff [AR 247-50], and a state agency psychiatrist, Dr. Kelley Rumbyrt, reviewed Plaintiff's record and provided an opinion as to Plaintiff's RFC [AR 93-103].

### A.   Amy E. Ellis, M.D.

Dr. Ellis, who further identified herself as a psychiatrist at ADMHN, completed on April 10, 2012, a Mental Assessment of Work-Related Activities regarding Plaintiff based on her treating relationship with Plaintiff, diagnosing her with depressive disorder not otherwise specified ("NOS"), PTSD, anxiety disorder NOS, and cocaine abuse. [AR 256]  She noted Plaintiff "has severe panic attacks multiple times a day [and] reports having a difficult time sleeping due to her anxiety." [AR 257]  She marked the following signs and symptoms as affecting Plaintiff: appetite disturbance with

7

weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks,

feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation,

decreased energy, intrusive recollections of a traumatic experience, and generalized anxiety.  [AR

256-57]  Dr. Ellis described that Plaintiff "often presents tearful during appointments.  Symptoms

include: frequent awakenings throughout the night, GI problems due to anxiety, hypersensitiv[ity]

to criticism" and stress leading to her fainting one time and having headaches that require her to sit

"in the back at her current job."  [AR 258]  Dr. Ellis found Plaintiff had severe limitations in her

inability to accept criticism from supervisors, deal with changes in a routine work setting, and

respond appropriately to the general public.  *Id*.  Dr. Ellis also noted Plaintiff had severe limitations

in social functioning, difficulties in maintaining concentration, persistence or  pace, and continual

"episodes of decompensation each of extended duration."  *Id*.  She also commented that Plaintiff

"has used cocaine in the past but has 156 days of sobriety and on 11/09/2011 she had 333 but missed

a random [urinalysis] and her sober days dropped to [zero]."  [AR 259]

B.    Michael H. LeBlond, Ph.D.

Dr. LeBlond completed on September 5, 2012, a Mental Assessment of Work-Related

Activities regarding Plaintiff based on his treating relationship with Plaintiff at ADMHN.  [AR 493-

97]  He noted the same diagnoses as Dr. Ellis and marked the same signs and symptoms as Dr. Ellis,

with the exception of adding two more symptoms not indicated by Dr. Ellis: paranoia or

inappropriate suspiciousness, and feelings of guilt/worthlessness.  [AR 494]  He noted Plaintiff

experiences "somatic issues such as GI problems and migraines," but that is was "unclear if these

are explained by organic disturbance."  *Id*.  He further wrote: "Client has severe panic attacks on

frequent recurring basis with chronic anxiety and sleep disturbance resulting in negative impact to work and social environments, as well as somatic issues." [AR 495] He noted marked limitations in Plaintiff's inability to accept criticism from supervisors, inability to deal with changes in a work setting, and difficulties in maintaining concentration, persistence or pace. *Id*. Dr. LeBlond also opined that "client's onset of anxiety/PTSD was prior to her substance use" and that "client's primary drug of choice was cocaine – currently in remission." [AR 497]

C.   Gilbert Milburn-Westfall, Psy.D.

Dr. Milburn-Westfall, a consultative examiner hired by SSA, conducted a diagnostic interview and evaluation with detailed mental status of Plaintiff on June 2, 2011. [AR 247] Dr. Milburn-Westfall noted Plaintiff was "currently working at Discovery Research Group, a survey company she started March of 2011, and currently works 20 hours per week, doing surveys on the telephone." [AR 248] She reported she was "performing her duties okay" but that "sometimes her anxiety and sense of foreboding cause her to leave before the end of her shift." *Id*. She reads in her free time, including on the weekend "read[ing] all day." *Id*. She started drinking at age 12 and "has had ongoing periods of excessive and problematic drinking and binge drinking" and has "used multiple street drugs, marijuana, crack cocaine, and methamphetamine" with her "drug of choice" being crack cocaine, used from age 18 until "just recently" on November 26, 2010, putting her in "partial remission." *Id*. Dr. Milburn-Westfall indicated Plaintiff has "a long and extensive involvement with the criminal justice system." *Id*. Plaintiff has been arrested "numerous times," including three felonies; she has spent a total of three years combined in various jails and was, at the time of the interview, on probation in Arapahoe County. *Id*.

Plaintiff did not report any medical problems. *Id*. As a patient at ADMHN, she was at the time of the interview receiving ongoing therapy and medications that she reports provide "good therapeutic benefit" and that "help to calm and relax her." *Id*. Regarding her mental status, Dr. Milburn-Westfall wrote:

> [Plaintiff] was cooperative, pleasant and friendly, with good eye contact. She sat in a relaxed position without any hyperactivity. She was initially anxious about being alone with a male person, but was able to establish good rapport and to relax. Her mood was mildly anxious throughout the interview. [She] was pleasant in her speech and spoke at a normal rate, demonstrating good verbal expressive skills and good receptive language skills. She was able to communicate effectively, and she had no problems with comprehension and tracking. Her thought processes were organized, logical and coherent, and she did not demonstrate any problems with her cognitive organization. She reports her concentration is generally okay, although she may have transient lapse because of intrusive thoughts of past trauma. She reports no problems with her memory. A manic screen revealed the absence of any manic symptoms. Also, there are no psychotic symptoms, no delusional thinking, no auditory or visual hallucinations. She reports 3 suicide attempts, 2 as a juvenile. Her last attempt was at age 22, when she took an overdose of pills. She reports no current suicidal thinking. Sleep is stable, averaging 6 to 7 hours at night. [She] does report symptoms of trauma. These include intrusive thoughts, inability to tolerate close settings, nightmares most nights, interpersonal hypervigilance, avoidance behavior, and checking behavior.

[AR 248-49] The doctor concluded that her depressive symptoms "appear to be resolved currently, and she appears to be working on managing her trauma symptoms." [AR 250] He assessed her a GAF of 65 and continued:

> Based on current medical status examination, [Plaintiff] demonstrates good cognitive organization and is likely to be able to sustain focused concentration and attention at a task over an extended period of time. Her communication skills are good, and she is able to communicate effectively and adaptively with the public and coworkers in a job situation. Given her trauma symptoms, [Plaintiff] would likely function better in an employment setting where she has limited contact with men, and generally limited contact with large numbers of people. She appears to be managing her 20-hour-a-week job doing surveys. However, her intrusive thoughts of past

abuse sometimes cause her to leave her job early.

[AR 250]

     D.    <u>Kelley Rumbyrt, M.D.</u>

In June 2011, state agency psychiatrist Dr. Kelly Rumbyrt reviewed the record and concluded Plaintiff had "moderate" mental limitations, and that she had no restriction of activities of daily living, moderate restriction in social functioning, mild difficulty in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. [AR 93] Dr. Rumbyrt noted Plaintiff's main difficulties were in the area of intrusive memories and anxiety from her history of trauma. *Id.* In a Mental RFC Assessment, Dr. Rumbyrt opined that Plaintiff could not work closely with supervisors or coworkers and should have minimal to no interaction with the general public, but she could accept such supervision or contact if it were not too frequent or prolonged. [AR 100-01, 111] Therefore, despite "moderate" mental limitations, as long as work did not require more than simple instructions, ordinary routines, or simple work decision making, Plaintiff's limitations in attendance and pace would not prevent the completion of a normal workday/workweek or significantly reduce her pace. [AR 112]

     E.    <u>Mark Dilger, M.D.</u>

In July 2011, Dr. Dilger, a psychiatrist, completed a Medical Consultant's Review of Mental RFC and a Medical Consultant's Review of Psychiatric Review Technique Form, agreeing with the opinion of Dr. Rumbyrt.[3] [AR 252-55]

---

[3]Plaintiff asserts the state agency physicians – Dr. Rumbyrt and Dr. Dilger – did not specify their medical specialty in the record; however Defendant notes that each provided consultant code 37 next to the signature field [*see* AR 251, 253], indicating psychiatry. *See*

**IV.     Hearing Testimony**

The ALJ held an administrative hearing on September 11, 2012.  [AR 47]  Plaintiff was

represented by counsel.  *Id.*

Plaintiff testified at the hearing.  [AR 55-69]  She indicated she completed "some college"

and currently worked approximately 16 hours per week doing telephone surveys at a "phone center"

called Discovery Research Group.  [AR 55]  She also previously had a full-time job as a dental

hygienist and before that worked part-time as a waitress.  [AR 56]  She testified that she could not

work full-time any longer because of her anxiety, further explaining:

> I tend to feel closed in.  I feel fearful of other people.  Men are a factor in it, too.
> And my medicine doesn't always give me the relief that I need to be able to stay at
> work.  If I have to up my dose, then I have to go home because it makes me drowsy.
> []  [W]hen I feel my anxiety coming on, I start out with a piece of [an anti-anxiety
> prescription], and if it doesn't work, I have to increase it to try to get me to calm
> down.  The higher the dose, the more drowsiness occurs.

[AR 58 (ALJ question omitted).]  Plaintiff said she lives with and cares for her two grandchildren,

then ages six and three, although Plaintiff's mother, sister, and niece help with the children if

Plaintiff has a migraine or is feeling anxious.  [AR58-59]  Migraines occur two-to-three times a

month.  [AR 66]

Plaintiff described her typical day as waking in the morning, getting ready for work, getting

the grandchildren ready, having the babysitter arrive, going to work from 8 a.m. to 3 p.m. three days

every week and every other Friday, for a total of 14 days of work a month.  [AR 59-60]  However,

Plaintiff said she leaves her shift early five-to-ten times a month, or most days she works.  [AR 60]

---

Program Operations Manual System (POMS) DI 26510.090, *available at* 2002 WL 1878678.

On days that Plaintiff is not working, she attends classes required for her "court program," where "you stand before [a] magistrate, and she does a review of how you're doing, asks you how your week was, how you're feeling." [AR 60] Plaintiff goes to that court program every other Friday. After work or the program each day, she spends time with her grandchildren. [AR 61] She testified that she has problems grocery shopping but has no problems concentrating while watching television. [AR 62] She also noted trouble sleeping, causing her to wake four-to-five times a night "even with medication." [AR 63]

Plaintiff's attorney questioned her during the hearing, largely focusing on her anxiety issues. [AR 63-67] Plaintiff said she has panic attacks at work and in other places. *Id*. The panic attacks also can cause stomach pain and gastrointestinal issues. [AR 66] Plaintiff said when a panic attack occurs, she cannot concentrate, saying, "I can't keep a clear mind and I'm – at that time, I'm very fearful, and I'm very fearful of others doing something to me." [AR 67] Anxiety occurs at work when Plaintiff is criticized by her boss; Plaintiff testified that makes her feel "not very good" and she gets "snappy" and "defensive," and she usually tries to "walk it off" or just goes home. [AR 64] Plaintiff's boss does, however, find ways to accommodate the panic attacks, as Plaintiff described:

> My boss [] knows very well about mental health court, and she knows me from before [when] I left in good standing, and I'm a good employee, but she also recognizes my signs and symptoms, and when the space is available, I can always work on a back computer.

[AR 65 (name of boss omitted).]

Robert Schmidt, a vocational expert ("VE"), also testified at the hearing. [AR 67] The ALJ provided a hypothetical to the VE as follows: "If we had someone who could have only occasional

work interactions with coworkers and supervisors and rare to no work interactions with the general public, would any of [Plaintiff's former] jobs be possible?"  [AR 69-70]  The VE responded that those restrictions would eliminate all previous work, but such a person could perform other jobs existing in significant numbers in the national economy, including that of a production assembler, a price marker, or an office helper.  *Id*.  The ALJ also asked the VE to consider if the person were unable to accept criticism from supervisors; the VE responded that such a person "would not be employable."  [AR 70]  Plaintiff's attorney asked the VE how the restriction on having "limited contact with men" would affect her employment.  [AR71]  The VE noted that contact with females and not males would be more prevalent in the office supervisor jobs.  [AR 71-72]

The ALJ issued an unfavorable decision on September 26, 2012.  [AR 27-45]

## LEGAL STANDARDS

**I.      SSA's Five-Step Process for Determining Disability**

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382.  Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.  *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.   *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).   Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).   "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).   However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.   *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### ALJ's RULING

The ALJ ruled that Plaintiff is capable of performing a full range of work at all exertional levels with nonexertional limitations of having only occasional work interaction with supervisors and coworkers and rare to no work interaction with the general public.  [AR 34]  Going through the five-step process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since

September 26, 2010, the alleged onset date (Step One).  [AR 32]  Further, the ALJ determined that

Plaintiff has the following severe impairments: a history of depressive disorder not otherwise

specified, PTSD, anxiety disorder, and substance abuse of alcohol and cocaine (Step Two).  [AR 33]

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments

that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial

gainful employment (Step Three).  *Id*.  In making that finding, the ALJ noted that she considered

whether the "paragraph b criteria of the adult mental disorders" were satisfied:

> To satisfy the "paragraph b" criteria, the mental impairments must result in at least
> two of the following: marked restriction of activities of daily living; marked
> difficulties in maintaining social functioning; marked difficulties in maintaining
> concentration, persistence, or pace; or repeated episodes of decompensation, each of
> extended duration.  A marked limitation means more than moderate but less than
> extreme.  Repeated episodes of decompensation, each of extended duration, means
> three episodes within one year, or an average of once every four months, each lasting
> for at least two weeks.

[AR 33; *see also* 20 C.F.R. § 404.1529(b).]  The ALJ also considered whether "paragraph c" criteria

were satisfied, which requires evidence of:

> repeated episodes of decompensation, each of extended duration, no residual disease
> process that has resulted in such marginal adjustment that even a minimal increase
> in mental demands or change in the environment would be predicted to cause the
> claimant to decompensate, and no current history of one or more years' inability to
> function outside a highly supportive living arrangement with an indication of
> continued need for such arrangement.

[AR 34; *see also* 20 C.F.R. § 404.1529(c).]

In evaluating the "b" and "c" criteria, the ALJ relied on the opinions of the nonexamining

sources, explaining that Dr. Rumbyrt and Dr. Dilger both found Plaintiff's degree of functional

limitation to be "none" in restriction of activities of daily living, "moderate" in difficulties in

maintaining social functioning, and "mild" in difficulties in maintaining concentration, persistence, or pace, and found no episodes of decompensation to establish the presence of the "C" criteria of the listings.  [AR 33]  The ALJ noted that she did consider the medical opinions of the treating doctors as follows:

> I did consider the medical assessment of Dr. Amy Ellis, M.D., (Ex. 6F), who opined the claimant degree of functional limitation was "marked" in difficulties in maintaining social functioning, and in difficulties in maintaining concentration, persistence or pace, with continual episodes of decompensation each of an extended duration, and the medical assessment of Dr. Michael LeBlond, Ph.D., who opined "marked" difficulties in concentration, persistence or pace, and "continual" episodes of decompensation each of an extended duration.  (Ex. 17F/4).  However, little weight is afforded to the opinions of Dr. Ellis and Dr. LeBlond in this regard, as such level of severity is not supported by their treatment notes, by treatment notes of others, by consultative findings, or by the record as a whole, with the record showing no evidence of any decompensations, but for an apparent short-term duration in November 2010 when the claimant relapsed on cocaine and was non-compliant with treatment recommendations.

[AR 33-34] The ALJ thus concluded that neither the "B" or "C" criteria were satisfied, showing less severity of mental impairments than that put forth by the treating physicians.  [AR 34]

The ALJ then determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: she can have only occasional work interactions with supervisors and coworkers, and rare to no work interaction with the general public."  *Id*.  In making this decision, the ALJ found Plaintiff to be less than fully credible and that the evidence failed to lead to a conclusion that Plaintiff is totally disabled and unable to sustain any work activity.  [AR 35]  The ALJ went on to determine that Plaintiff is unable to perform any past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy.  [AR 39-40]

As a result, the ALJ concluded (at Step Five) that Plaintiff was not disabled and, therefore, was not under a disability as defined by the SSA.  [AR 41]

Plaintiff sought review of the ALJ's decision by the Appeals Council on October 9, 2012. [AR 25]  On April 3, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-6]  Plaintiff timely filed her Complaint in this matter on April 21, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following two issues: (1) the ALJ failed to properly apply the correct legal standard when evaluating the medical evidence and assigning an RFC to Plaintiff; and (2) the ALJ's determination that Plaintiff could perform other work in the economy was based on the wrong legal standard and not supported by substantial evidence.

## ANALYSIS

### I.   Whether the ALJ Properly Applied the Correct Legal Standard when Evaluating the Medical Evidence and Assigning an RFC to Plaintiff

Plaintiff argues that the ALJ did not give "controlling weight" to the opinions of Plaintiff's treating physicians – Drs. Ellis and LeBlond – as the ALJ should have done if the opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [were] not inconsistent with the other substantial evidence in [the] case record."  Opening Brief, docket #13 at 16.  Defendant disagrees and indicates the ALJ's opinion "reasonably weighed the medical opinion evidence and included in [her RFC] all credible limitations supported by the record" and

thus should be affirmed.  Response, docket #16 at 10.

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying SSR 96-2p, 1996 WL 374188, at *2) (internal quotation marks

and citations omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300. At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330. If this is not done, remand is mandatory. *Id.* As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4) (emphasis added). Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis"). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's

> opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.   However, an ALJ is not required to "apply expressly" every relevant factor for weighing opinion evidence. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).   For example, when an ALJ cited several exhibits, having summarized those exhibits earlier, and explained the basis for his finding, the ALJ had done enough to weigh the opinion evidence. *See Endris v. Astrue*, No 12-6126, 2012 WL 6685446, at *2-3 (10th Cir. Dec. 26, 2012).   In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330.   Lastly, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so. *Watkins*, 350 F.3d at 1301.   The ALJ may reasonably discount a treating physician's opinion that was inconsistent with statements from the claimant. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078-79 (10th Cir. 2007).   The ALJ must consider consistency of notes from the treating physician. *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).   The ALJ also must consider whether an opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(4).

Here, the Defendant argues and the Court agrees that the ALJ "articulated legally sufficient reasons for discounting Dr. Ellis's and Dr. LeBlond's opinions as they were inconsistent with their

[own] treatment records and with the record as a whole." Response, docket #16 at 12. The ALJ's opinion indicates that she considered the medical opinions of the treating doctors as follows:

> I did consider the medical assessment of Dr. Amy Ellis, M.D., (Ex. 6F), who opined the claimant degree of functional limitation was "marked" in difficulties in maintaining social functioning, and in difficulties in maintaining concentration, persistence or pace, with continual episodes of decompensation each of an extended duration, and the medical assessment of Dr. Michael LeBlond, Ph.D., who opined "marked" difficulties in concentration, persistence or pace, and "continual" episodes of decompensation each of an extended duration. (Ex. 17F/4). However, little weight is afforded to the opinions of Dr. Ellis and Dr. LeBlond in this regard, as such level of severity is not supported by their treatment notes, by treatment notes of others, by consultative findings, or by the record as a whole, with the record showing no evidence of any decompensations, but for an apparent short-term duration in November 2010 when the claimant relapsed on cocaine and was non-compliant with treatment recommendations.

[AR 33-34]  The ALJ also extensively cited the medical record, noting Plaintiff's treating doctors assessed her with a major depressive disorder, PTSD, and cocaine dependence in remission. *Id*. The ALJ then, however, reviewed treating doctors' notes in detail, highlighting the apparent connection between compliance with the drug treatment program and Plaintiff's health versus her use of drugs and relapsing conditions. [AR 32-39] For example, the ALJ discussed the disconnect between the conclusion of marked difficulties and the notes: Plaintiff had "psychiatric symptoms returning to baseline," with Plaintiff "pleasant, well-groomed, moods have stabilized, affect full, thought process linear and without derailments, cognitive ability intact" in September 2010 and "flashbacks have decreased in frequency, pleasant, calm and cooperative, mild drug dreams, moods good, full affective range" in October 2010.   [AR 36]. The ALJ then noted Plaintiff reported in November 2010 that she had relapsed into use of cocaine; by January the medical notes indicate she was having mood swings and was unable to focus as she "is unable to break away from the pipe." *Id*. However,

"after once again complying with treatment recommendations, by February 2011 she was 'abstinent 90 days,' and found 'mood good, no acute distress.'" *Id.*

The ALJ's opinion continued with an additional discussion of treating doctors' notes, indicating Plaintiff does better with structure and rules" that have been helpful in maintaining her recovery, including "having somewhere to go, being in program, having a job, doing homework" – all helping her be more responsible. [AR 37] The ALJ noted a mental status report from February 2012 showed Plaintiff "within normal limits" and "progress notes in 2012 continue to show stabilization in mood with little complaints." *Id.* The ALJ highlighted that this progress reversed in May 2012 – when Plaintiff was again convicted of shoplifting. *Id.*

The ALJ also considered the opinions of Dr. LeBlond and gave them little weight as he relied on Dr. Ellis's notes, writing in his report, "see attachments from Dr. Ellis previously submitted" – the same notes that showed Plaintiff relapsing on cocaine. [AR 39] The ALJ thus found "for the same overall reasons just explained [regarding Dr. Ellis's opinions], the record fails to support the marked limitations opined by Dr. LeBlond." *Id.* The ALJ also explained that the form Drs. Ellis and LeBlond completed used "marked" limitations in a way inconsistent with the Office of Disability's definition of marked, the latter being more serious, an issue not addressed in any way by Plaintiff in her Opening Brief. [AR 39] The ALJ then broadly concluded:

> At any rate, such level of severity is not supported by the record as a whole and, while the claimant did have a decrease in functioning in November 2010, this appears due to drug use and non-compliance in treatment, and thus the record certainly does not show such increased symptoms in longevity.

[AR 39]

Furthermore, extensive parts of the opinion explain that the ALJ discounted the treating physicians' opinions in part based on serious concerns regarding Plaintiff's credibility.  [AR 35] While Plaintiff's Opening Brief does not address these concerns [*see generally* Plaintiff's Opening Brief, docket #13], the ALJ provided a detailed description of her findings regarding why Plaintiff's assertions were less than credible, including Plaintiff's admission that she stopped working because she was sent to jail – not because she was disabled.  [AR 35]  "The evidence further suggests the claimant has a habitual disinclination for activity and does not suggest the claimant is well-motivated to work consistently, with a review of the claimant's work history showing the claimant worked only sporadically prior to her alleged disability onset date," the ALJ wrote, "which raised a question as to whether the claimant's unemployment is actually due to any medical impairment." *Id*.  The ALJ also discussed the disparity between Plaintiff's assertion that she had previously performed the same job at the call center well in 2009, before the alleged onset of disability, yet earnings reports showed only a few thousand dollars earned at the job.  *Id*.  Additionally, the ALJ commented that Plaintiff has been working 16-20 hours per week doing surveys on the telephone with the general public, despite her allegation that she has difficulty working with the public – "work activity that does not enhance her credibility in this manner, and in fact suggests a capacity for significant functioning," and "thus it is difficult to avoid the conclusion that the claimant's current part time work activity and at the same job and same employer is of little difference due to the claimant's own motivational aspect, than due to any current impairment limiting her ability to work greater hours." *Id*.

Plaintiff's "long and extensive involvement with the criminal justice system" also affected

the ALJ's opinion of Plaintiff's credibility.  [AR 36]  Plaintiff has been arrested "numerous times" but could not give a number to be more specific; she has had multiple felony arrests; she has served a total of three years in various county jails; she reports 14 convictions for shoplifting; and she was on probation at the time of the hearing.  *Id*.  Additionally, the ALJ wrote:

> There is evidence that the claimant has a pattern of not telling the truth, including that the claimant "admitted she lied to the court, as well as Mental Health Center staff," and [] despite an attestation in her disability application, the claimant later admitted her statement of becoming unable to work due to her impairments on her onset date was not true.  Thus, as the claimant clearly had no difficulty with lying to a judicial Judge, there is an inference that the claimant would not have any difficulty lying to an [ALJ] in her quest to obtain monetary benefits.

*Id*. (internal citation omitted).

For the plethora of detail the ALJ provided to indicate her reasoning regarding the weighing and discounting of the treating physicians' opinions, the Court finds that the ALJ's decision should not be disturbed on review.

## II.   Whether the ALJ's determination that Plaintiff could perform other work in the economy was based on the wrong legal standard and not supported by substantial evidence

Plaintiff secondly argues the ALJ's hypothetical posed to the VE did not "with precision" include all of Plaintiff's impairments so therefore could not be properly relied upon by the ALJ in her decision.  Opening Brief, docket #13 at 20.  The Court notes that Plaintiff fails to indicate which impairments were excluded from the questioning, however the Court agrees with Defendant that the hypothetical to the VE need only include those limitations found credible by the ALJ.  *See* Response, docket #16 at 17 (citing *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (ALJ was not required to include in his RFC assessment limitations those not supported by the medical

record).)  The ALJ is not required to question the VE about limitations the ALJ already reasonably discounted as part of the RFC finding.  *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) ("The ALJ was not required to accept the answer to the hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record.")  Here, the hypothetical question posed by the ALJ included all the limitations the ALJ found credible.  [AR 69-70 (described in detail *supra*).]  Thus, the Court thus finds that the ALJ did not err in her questioning of the VE.

## CONCLUSION

For the foregoing reasons, the Court concludes the ALJ properly applied the correct legal standard when evaluating the medical evidence and assigning an RFC to Plaintiff and properly determined that Plaintiff could perform other work in the economy.  The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied.  Therefore, the decision of the ALJ that Plaintiff Shamone McEwen was not disabled and the final order of the Commissioner are **affirmed**.

Dated at Denver, Colorado this 14th day of September, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

27